UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.** **Case No. 25-CR-150**

**LARRY D. CANFIELD,**

**Defendant.**

---

# RECOMMENDATION AND ORDER

---

Pending before the court is defendant Larry Canfield's motion to dismiss the original indictment (ECF No. 81), motion to suppress (ECF No. 83), and motion to dismiss the superseding indictment (ECF No. 93).

## 1. Procedural History

The grand jury returned an indictment on August 12, 2025, charging Larry Canfield with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (ECF No. 1.) The case unfolded in a contentious and delayed fashion, involving multiple requests for extensions of time, requests for an evidentiary hearing, a motion to compel, and a prior motion to suppress that was ultimately withdrawn. (ECF Nos. 8, 11, 13, 15, 29, 35, 37, 46, 47, 48, 50.)

On July 21, 2026, Canfield filed (1) a motion to dismiss the sole count in the original indictment on Second Amendment grounds (ECF No. 81), and (2) a motion to suppress all evidence derived from his warrantless arrest, the warrantless seizure and alleged pre-warrant search of his vehicle, the allegedly tainted subsequent search warrant, and the purported surveillance allegedly used to locate him (ECF No. 83).

On August 11, 2026, the government filed a superseding indictment charging Canfield with possessing a firearm after having been convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(8). (ECF No. 87.) On September 9, 2026, Canfield filed a motion to dismiss the superseding indictment on Second Amendment grounds. (ECF No. 93.)

The motion to suppress and motion to dismiss the superseding indictment are fully briefed.

**2. Motion to Dismiss the Original Indictment**

The government has not responded to Canfield's motion to dismiss the original indictment, even after the court gave the government an unsolicited extension of time in which to do so. (*See* ECF No. 96.) "An original indictment remains pending prior to trial, even after the filing of a superseding indictment, unless the original indictment is formally dismissed." *United States v. Brown*, 973 F.3d 667, 698–99 (7th Cir. 2020) (citation omitted). The court infers from the government's silence that it does not oppose Canfield's motion to dismiss the original indictment and seeks only to prosecute him

pursuant to the superseding indictment. Therefore, the court will recommend that Canfield's motion to dismiss the original indictment (ECF No. 81) be granted.

**3. Motion to Dismiss the Superseding Indictment**

Canfield moves under Federal Rule of Criminal Procedure 12(b)(3) to dismiss the sole count of the superseding indictment, which charges him with possessing a firearm after a conviction for a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9). (ECF No. 93 (citing superseding indictment, ECF No. 87).) For purposes of this motion, Canfield accepts that his 2007 battery conviction under Wis. Stat. § 940.19(1) is a qualifying predicate under § 922(g)(9). (ECF No. 93 at 4 n.1.)

A defendant can move to dismiss an indictment before trial "on the basis that the charged offense is based on an unconstitutional statute." *United States v. Rice*, 662 F. Supp. 3d 935, 937 (N.D. Ind. 2023) (citing Fed. R. Crim. P. 12(b)(3)(B)). "To succeed on a facial challenge to the constitutionality of a statute, the moving party must show that the statute is unconstitutional in all applications." *Id.* (citing *City of L.A. v. Patel*, 576 U.S. 409, 418 (2015)). To succeed on an as-applied challenge, the moving party must demonstrate that the statute is unconstitutional as applied to the facts of the case and not necessarily any set of hypothetical facts. *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011).

Canfield challenges only the applied constitutionality of the statute. He argues that § 922(g)(9) is unconstitutional as applied to him because his predicate conviction was nearly eighteen years old at the time of the events now in question, did not involve a

firearm, and resulted in a probationary sentence that he completed years ago. (ECF No. 93 at 1.) Canfield acknowledges that the complaint underlying the predicate conviction reflects that "S.P. reported that Canfield punched her several times in the back and side without her consent, causing pain." (ECF No. 93 at 2.) After Canfield pled guilty to that charge, the state court imposed and stayed a sentence of six months in the House of Corrections and placed him on probation for fifteen months, which term he successfully completed. (*Id.*)

The government responds that the court should not consider as-applied challenges to § 922(g)(9) but, even if it does, Canfield's prior misdemeanor conviction presents the requisite threat to physical safety to withstand constitutional scrutiny. (ECF No. 94 at 13–18.)

The applicable constitutionality framework for this disarmament statute was established by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Under *Bruen*, courts must consider whether "the Second Amendment's plain text covers an individual's conduct" and, if so, whether the government has "affirmatively prove[n] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 597 U.S. at 17–19. The government does not dispute that the Second Amendment's plain text covers Canfield's conduct in this case. (*See generally* ECF No. 94.)

In *United States v. Rahimi*, 602 U.S. 680, 692 (2024), the Supreme Court clarified that a statutory prohibition on the right to possess a firearm is consistent with our nation's historical tradition of firearm regulation if the government demonstrates that the challenged regulation is "relevantly similar" to laws that our tradition is understood to permit. The modern and historical laws are relevantly similar, or analogous enough to pass constitutional muster, if they share both "why" and "how" they burden the Second Amendment. *Rahimi*, 602 U.S. at 692.

This court and two district judges in this district have already upheld the facial constitutionality of § 922(g)(9) under *Bruen*'s framework. *United States v. Gonzalez*, No. 26-CR-2-JPS, 2026 WL 2138067, 2026 U.S. Dist. LEXIS 164545 (E.D. Wis. July 24, 2026) (adopting this court's recommendation); *United States v. Jones*, No. 24-CR-70-LA, ECF No. 24 (E.D. Wis. Nov. 25, 2024). But, again, Canfield challenges the statute only as applied to him and not on its face.

The Fifth and Ninth Circuit Courts of Appeals have categorically rejected as-applied challenges to § 922(g)(9). *See United States v. Allred*, 182 F.4th 448, 454 (5th Cir. 2026) (relying not "on the specific circumstances underlying [the defendant's] predicate conviction" but on the fact that he was convicted of a crime qualifying as a "misdemeanor crime of domestic violence"); *United States v. Martinez*, 169 F.4th 1147, 1157 (9th Cir. 2026) (finding that the court "need not engage in a misdemeanor-by-misdemeanor inquiry" because the statute reflects "Congress's determination that members of a class of

convicted criminals are dangerous”). However, the Fourth Circuit Court of Appeals remanded a case challenging § 922(g)(9) because the factual record was insufficiently developed to determine whether the defendant’s as-applied challenge had merit. *United States v. Jacobs*, 166 F.4th 395, 400 (4th Cir. 2026).

Canfield argues that the Seventh Circuit Court of Appeals’ recent decision in *United States v. Watson*, 171 F.4th 1012, 1017 (7th Cir. 2026), supports an individualized, as-applied review. (ECF No. 93 at 9.) In *Watson*, the Seventh Circuit upheld § 922(g)(1) as applied to the defendant because his predicate felony was a drug trafficking conviction, which was “inherently dangerous.” 171 F.4th at 1013. The court did not analyze the circumstances of Watson’s conviction but summarily concluded that he was “dangerous” because he had a “felony drug conviction” and “guns and drugs together are dangerous.” *Id.* at 1023–24.)

Canfield contends that “an appeal to dangerousness at a high level of generality is not enough” because “the proposed analogue must establish the circumstances under which disarmament was permitted, the process used to identify the threat, and the duration and scope of the burden.” (ECF No. 83 at 3–4.) Canfield’s comments about circumstances, process, duration, and scope appear to be his attempt to fit within *Rahimi*’s imperative to compare “why” and “how” the modern and historical laws burden the Second Amendment. *Rahimi*, 602 U.S. at 692. But these comments have been addressed by the broad facial constitutionality of § 922(g)(9) that Canfield does not challenge. *See*

*United States v. Gonzalez*, No. 26-CR-2-JPS, 2026 WL 2138067, 2026 U.S. Dist. LEXIS 164545 (E.D. Wis. July 24, 2026) (concluding that the historical collection of surety and going armed laws constitute the requisite "historical analogue" under *Bruen* to uphold the facial constitutionality of § 922(g)(9)). The Seventh Circuit's general conclusion in *Watson* that "guns and drugs together are dangerous" could easily be replaced by the observation that "guns and domestic violence together are dangerous." *See, e.g.*, "Guns and Domestic Violence are a Deadly Combination," National Network to End Domestic Violence (April 12, 2017), https://nnedv.org/latest_update/guns-domestic-violence-deadly-combination/ ("The presence of a gun in domestic violence situations increases the risk of homicide for women by 500%.").

Even if an individualized review is appropriate, Canfield's arguments against constitutionality are not persuasive. Canfield argues that his predicate conviction is too old to justify disarming him for dangerousness today because no credible threat analysis was conducted to determine his future dangerousness. (ECF No. 93 at 5–11.) He claims that generalized evidence about recidivism does not establish a founding-era tradition of permanent disarmament. (*Id.*)

"But someone who posed a risk in the past does not mean they no longer do so. Scholars agree that … the recidivism rate for domestic-violence offenders is high." *United States v. Gailes*, 118 F.4th 822, 829 (6th Cir. 2024). In *Rahimi*, the Supreme Court upheld the facial and as-applied constitutionality of 18 U.S.C. § 922(g)(8), which prohibits certain

individuals subject to restraining orders, i.e., those found by a court to pose a credible threat to the physical safety of another, from possessing firearms. 602 U.S. at 700. The Court found a historical tradition of disarming, "through ordinary criminal laws and civil actions," persons "who physically threatened others." *Id.* at 694.

The safety risk posed by people previously convicted of a "misdemeanor crime of domestic violence," as that term is defined in 18 U.S.C. § 921(a)(33),[1] is consistent with that posed by people subject to domestic violence restraining orders, as well as the risks underpinning our nation's tradition of surety and going armed laws. *See Rahimi*, 602 U.S. at 698 ("Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.").

It is true that disarmament under § 922(g)(8) is constrained by the length of the restraining order and requires an express determination that the defendant poses a threat to his domestic relations. But the predicate conviction under § 922(g)(9), which carries a higher burden of proof than a civil restraining order, requires evidence that the defendant used or attempted to use physical force or threatened the use of a deadly weapon. *See* 18

---

[1] Section 921(a)(33) sets forth several due process requirements to establishing the misdemeanor crime of domestic violence, including that the defendant "was represented by counsel in the case or knowingly and intelligently waived the right to counsel in the case" and that the conviction resulted from a jury trial unless the person knowingly and intelligently waived that right. Canfield does not argue that his prior conviction fails these safeguards or otherwise falls outside the statute's scope.

U.S.C. § 921(a)(33)(A)(ii). Accordingly, the threat to physical safety is established by the prior use and/or threat of force found beyond a reasonable doubt.

Canfield contends that he completed his sentence for the predicate conviction well before the events in question. But he does not cite any case holding that § 922(g)(9) is unconstitutional as applied to defendants who have completed their sentences for their prior convictions. "Rather, to the extent courts have contemplated as-applied challenges, they have often focused on the distinction between violent and non-violent prior convictions, not whether the defendant completed a prior sentence." *United States v. Jones*, Case No. 24-CR-70-LA, ECF No. 24 at 11 (E.D. Wis. Nov. 25, 2024) (denying as-applied constitutional challenge to § 922(g)(9)).

Moreover, "the ban may not even be 'permanent' given that 'domestic-violence misdemeanants can (1) petition to set aside their conviction; (2) seek a pardon; (3) have their conviction expunged; or (4) have their civil rights fully restored.'" *United States v. Gonzalez*, No. 26-CR-2-JPS, 2026 WL 2138067, at *5, 2026 U.S. Dist. LEXIS 164545, at *17 (E.D. Wis. July 24, 2026) (citing *Gailes*, 118 F.4th at 829).

Canfield argues that his prior misdemeanor conviction did not involve a firearm. Even so, he does not deny that it involved the use of physical force against a domestic partner. (ECF No. 93 at 1.) This type of behavior is undoubtedly dangerous.

Accordingly, the court concludes that Canfield poses the type of threat to physical safety that the statute targets, and it is constitutional as applied to him. The court will

therefore recommend that the district judge deny his motion to dismiss the superseding indictment (ECF No. 93).

### 4. Factual Background for Motion to Suppress

The following factual summary is undisputed unless otherwise noted.[2]

On Friday, February 14, 2025, at approximately 4:35 PM, B.R. called 911 alleging that Canfield had come to her home, broken her windows, kicked at her door, and threatened to harm her. (Media Ex. 1, 911 call at 0:00–2:51; Computer Aided Dispatch (CAD) Printout, Supp_160.) When the 911 operator asked if Canfield had a weapon, B.R. said she was sure he did have a weapon but had not seen one that day. (911 call at 0:49–0:51, 1:24–27.)

At 4:58 PM, B.R. called 911 a second time. (Supp_160.) When asked whether there had been any change in circumstances since her first call, B.R. responded, "No. Well, yes. Uhm. I did see a weapon. He just put it in my face." (911 call at 3:28–36.) She stated that Canfield displayed a black handgun and left driving a white Infiniti with dark tinted windows. (911 call at 3:42–59.) B.R. said Canfield told her that he would "smoke" her and

[2] The parties rely on several exhibits—including documents, Excel spreadsheets, and videos—that they jointly submitted via a USB drive without unique ECF identifiers. (See ECF No. 62 (indicating exhibits are electronically stored).) The twenty-two documents were submitted across three PDF files that are not organized in any obvious manner. The parties provided an index on the USB drive that labels the contents of each exhibit but does not identify any exhibit's location among the files. Most, if not all, of the parties' timestamp citations to the various video exhibits are significantly inaccurate. The court will cite the exhibits according to the Bates stamp identifiers utilized by the parties but strongly discourages the parties from presenting and citing exhibits in this manner in the future. The court will also attach the parties' index to this report and recommendation for ease of reference.

that the altercation occurred "maybe like two minutes ago." (911 call at 4:24–29, 4:52–5:07.)

District 4 Officers Matthew Bremer and Michael Kimber were dispatched and arrived at B.R.'s home at 5:11 PM. (CAD Printout, Supp_159.) They learned that Canfield was at B.R.'s home to drop off their two shared children. (Domestic Violence Reports, Canfield_9.) B.R. stated that she previously told Canfield to let the kids out of the car to ring the doorbell because she did not want to have any contact with him. (Canfield_9.) B.R. stated that Canfield banged on her back door for approximately ten minutes before she opened it to let the children inside, at which point Canfield produced a black colored Glock style firearm from his waistband, pointed it at her face, and said, "I'll smoke you." (Canfield_9.)

Officers Bremer and Kimber spoke with Canfield and B.R.'s two shared children. (Domestic Violence Reports, Canfield_10.) Their report indicates that one of the children stated that he heard his mom yell to go to the front door, so he and his sibling started in that direction but, when he looked back, he saw his dad pull a black gun from his pocket, point it as his mom, and say "I'mma kill you." (Canfield_10.) The second child reported that he saw his dad retrieve a black handgun from the driver's seat of his car and place it in his waistband and that he saw Canfield grab the gun inside his coat pocket but did not see him remove the handgun before entering his mom's residence. (Canfield_10.) The

second child also noted that Canfield's girlfriend "Kayla" and Canfield's two-year old daughter were in the car when he was dropped off at B.R.'s residence. (Canfield_10.)

Officers Bremer and Kimber confirmed that Canfield did not "break anything" at B.R.'s residence, described the incident as "just the threats," and remarked that "point and aim" is a misdemeanor. (Media Ex. 2, Bremer body worn camera (BWC) at 3:29–31, 12:07–24.)

At 10:03 PM on February 14, 2025, a "wanted person—temporary misdemeanor" notice was entered into a Milwaukee Police Department (MPD) database. (Want for Canfield, Supp_1.) The following day, officers referred two misdemeanor charges to the Milwaukee County District Attorney's office: (1) disorderly conduct, and (2) pointing a firearm at a person. (ECF No. 83 at 5 (citing Domestic Violence Reports, Canfield_6, 15).)

Canfield acknowledges that a "District 4 Morning Briefing" document dated Monday, February 17, 2025, summarizes the February 14 investigation, listing Canfield's name, date of birth, address, his Wisconsin priors, a general description of his car ("white colored Infiniti sedan"), a weapon description ("glock style firearm"), and a short description of B.R.'s complaint. (ECF No. 83 at 6; *see also* District 4 Morning Briefing, Supp_5–8.) Canfield points out that the "morning briefing" did not state who received it, nor if, when, or how it was disseminated, and it did not indicate there was an arrest warrant or pending charges, nor did it explain where Canfield may be. (ECF No. 83 at 6.)

The government contends that, on February 17, 2025, District 4 officers Andrew Fuerte, Dustin Langfeldt and Jose Rivera were made aware that Canfield was a wanted subject who left the scene of the crime in a white Infiniti. (ECF No. 90 at 3.) Officer Fuerte reported that officers conducted an open record search of the cars registered to Canfield on February 17, 2025, and determined that he owned a 2009 white Infiniti G37 with license plate number AZD1413 and that a number of other vehicles were also listed to him. (ECF No. 90 at 3 (citing Arrest Reports, Canfield_41).)

In a subsequent report Officer Fuerte authored about finding Canfield's vehicle, he specified that, when he conducted an open record search in eTIME,[3] eleven cars were listed to Canfield, including a white Infiniti with Wisconsin license plate number AZD1413 and a white Cadillac with Wisconsin license plate number AXB6660. (ECF No. 90 at 4 (citing Fuerte Supplemental Report, Supp_177–78).) The government states that records from TIME, which the government also refers to as an "audit," confirm Officer Fuerte searched eTIME for Canfield by name at 8:21 AM on February 17, 2025. (ECF No. 90 at 4 (citing ECF No. 90-2).) The exhibit cited by the government (ECF No. 90-2) is a

[3] The parties variously reference e-TIME, e-Time, and TIME without explanation for what any of them are or whether they are different from each other. (*See* ECF Nos. 83, 90, 92.) The court infers that the parties are referencing eTIME (Electronic Transaction Information for Management of Enforcement), a system from the Wisconsin Department of Justice that "facilitates the accessing of information from various sources, including federal and local criminal records, automotive records, and security alerts." *See* "Wisconsin DOJ Awards Contract for Security of eTIME System," Government Technology, (July 27, 2010) https://www.govtech.com/security/Wisconsin-DOJ-Awards-Contract-for-Security.html. The court understands that eTIME is the electronic interface used to access the TIME database. *See* "TIME System and Acadis FAQ," Wisconsin DOJ, https://wilenet.widoj.gov/cib/time-system-training-materials-manuals-forms (referencing e-TIME access to the TIME system).

password-protected Excel spreadsheet submitted via USB drive that the court is unable to access.

In any event, Canfield does not challenge the government's contention that the audit of TIME records reflects that Officer Fuerte searched eTIME for Canfield by name at 8:21 AM on February 17, 2025. (ECF No. 92 at 4 (conceding that "[t]he newly produced TIME materials make part of the government's account more plausible").) Instead, Canfield argues that "the audit does not itself establish what information the officer actually saw, when [the license plate number for the white Cadillac,] AXB6660, was first identified, or how that plate became the subject of the FLOCK search shortly after repeated inquiries involving AZD1413." (*Id.* at 4.) Canfield also contends that the court should not rely on the audit because it was not produced[4] until after the pending motions were filed, and there is no evidence explaining how it was generated, what it reflects, and why the earlier audit materials were different. (*Id.* at 4–5.)

The parties agree that at 8:28 AM on February 17, 2025, Officer Langfeldt conducted the first of five FLOCK searches for license plate AZD1413, the plate registered to Canfield's white Infiniti. (ECF No. 83 at 7 (citing FLOCK Audit in Excel Spreadsheet, Supp_151–54).) At 8:57 AM, Officer Fuerte accessed B.R.'s 911 calls from February 14,

[4] The government states that Officer Fuerte made the TIME request for records on August 13, 2026, and received a response on August 17, 2026—after Canfield filed his motion to suppress on July 21, 2026. (ECF No. 90 at 4 n.2.)

2025. (ECF No. 83 at 7 (citing Canfield_121[5]). In total, three officers (Rivera, Fuerte, and Langfeldt) conducted twelve FLOCK searches on February 17, 2025: eleven for plate AZD1413 and, at 9:06 a.m., a single search for plate AXB6660, the license plate number for the white Cadillac. (ECF No. 83 at 7 (citing Supp_151–54).)

Officer Fuerte's search for plate AXB6660 occurred approximately twenty-one seconds after his last search for plate AZD1413. (ECF No. 83 at 7 (citing Supp_151–54).) Canfield contends that no report, CAD entry, body-camera footage, or audit log explains how officers learned of AXB6660 or that it was affixed to Canfield's Infiniti. (*Id.*) Canfield acknowledges that Officer Fuerte drafted a report nearly one year later claiming that the information came from a Wisconsin eTIME database (as described above), but he points out that the audit (at least the one produced prior to the government's brief in response to the present suppression motion) shows Fuerte's query occurred on February 18, 2025, the day after Canfield's arrest. (ECF No. 83 at 8 (citing TIME Record Search, Supp_65, 66).)

The government acknowledges that Officer Fuerte's FLOCK hit for plate AXB6660 was not preserved and that Fuerte did not provide a printout of the eTIME open record search on February 17, 2025, with his report. (ECF No. 90 at 4.) The government notes

[5] No exhibit labelled Canfield_121 exists among the discovery materials provided by the parties nor is it listed in the parties' index.

that eTIME records for the Cadillac and Infiniti showing the corresponding license plate numbers were printed on February 18, 2025. (ECF No. 90 at 4–5 (citing Supp_65–66).)

Based on what he alleges to be contradictory evidence about the identification of the license plate, Canfield objects to the court making any factual finding that "any license-plate hit existed, what camera captured it, or what results it provided." (ECF No. 83 at 8.)

At 10:07 AM on February 17, 2025, Officers Rivera, Fuerte, and Langfeldt reported being simultaneously "dispatched" and "on scene" at 5105 S. 27th Street, which is the location of a motel in the city of Greenfield near the corner of the intersection where the government claims the FLOCK camera hit on the license plate registered to Canfield's Cadillac (AXB6660) at N. 27th Street and W. Edgerton Avenue, which marks the border between the cities of Milwaukee and Greenfield. (ECF No. 83 at 8 (citing CAD Printout, Supp_162); ECF No. 90 at 4.) Between 10:32 and 10:42 AM, five District 6 officers—Matthew Bouzek, Nathan Povlick, John Lopez, Kurt Saltzwadel, and Brian Kobelinski—were dispatched to the same location and told to meet at 27th and Edgerton. (ECF No. 83 at 8 (citing CAD Printout, Supp_163–64).)

Officer Rivera's sworn statement for a subsequently procured search warrant reflects that, "while conducting undercover surveillance at this location," he observed Canfield exit a room at the motel, turn his white Infiniti on to presumably warm it up due

to the cold weather, place his belongings in the car, and walk toward the motel office. (Search Warrant, Canfield_60.) Rivera then notified "take down" officers. (Canfield_60.)

At 11:12 AM, Officers Fuerte, Langfeldt, Bouzek, Kobelinski, Lopez, Povlick, and Saltzwadel all turned on their body worn cameras[6] and headed to the motel parking lot to arrest Canfield. (ECF No. 83 at 8 (citing Axon Audits, Canfield_126, 149, 198, 210, 218, 222, 226).) Officer Rivera turned on his camera one minute later after the other officers already made contact with Canfield. (*Id.* (citing Axon Audit, Canfield_206; Media Ex. 12, Rivera BWC).)

Officers Langfeldt and Fuerte instructed Canfield to get on the ground and worked together to place him in handcuffs. (Media Ex. 5, Langfeldt BWC-1 at 0:44–1:10; Media Ex. 6, Fuerte BWC at 0:40–1:07.) Officer Langfeldt told Canfield we "got a warrant for your arrest" for being a "felon in possession of a firearm" and "pointing and aiming at your baby mama." (Langfeldt BWC-1 at 0:44–1:10; Fuerte BWC at 0:40–1:07.) Canfield told the officers that he "never did that" and that he had made a report at the police station. (Langfeldt BWC-1 at 1:10–32.) Officer Langfeldt responded, "no, you didn't." (Langfeldt BWC-1 at 1:32–33; Fuerte BWC at 1:24–25.) Canfield explained that he had heard B.R. on the phone telling the police that he busted her window, so he went straight to the police station to make a report and the paper was on his visor. (Langfeldt BWC-1

[6] Officer Saltzwadel's body worn camera footage offers no visual value because the lens appears to have been covered for the duration of the recording. (Media Ex. 10, Saltzwadel BWC.)

at 1:39–54.) Officer Langfeldt said, "You know you're a felon, right? So when she makes a claim that you got a pistol, that's felon in possession of a firearm." (Langfeldt BWC-1 at 1:54–59.)

Canfield was searched and no weapon was found on him. (Langfeldt BWC-1 at 1:25–2:45.) When asked if he would give officers consent to search his car, Canfield declined. (Langfeldt BWC-1 at 2:20–07.) While he was being searched, Canfield shouted to the officers across the parking lot, "Hey, if you look above my visor right now, it's right there, right now, you can check it out, the officer's name and everything." (Langfeldt BWC-1 at 2:21–27.) Canfield gave further instructions, "as soon as you open the visor, you're gonna see the paper from the officer, see that, look at that." (Langfeldt BWC-1 at 2:40–46.) Officer Langfeldt explained that, regardless of any false accusation Canfield reported, they received a report from B.R. that he pointed a gun at her and they would "take both sides seriously." (Langfeldt BWC-1 at 2:50–57.)

After Canfield's aforementioned instructions, Officer Fuerte opened the driver side door to the Infiniti, retrieved a community contact card from the visor, and showed it to Officer Rivera. (Fuerte BWC at 2:26–3:00; Media Ex. 12, Rivera BWC-1 at 1:00–25; Media Ex. 9, Lopez BWC at 2:04–2:32.) Officer Rivera placed the contact card on the dashboard and closed the driver side door of the Infiniti. (Fuerte BWC at 2:47–3:01.)

Numerous officers asked about and appeared to look in the car windows for a child who was reported to have been with Canfield in the Infiniti on February 14, 2025.

(Media Ex. 8, Kobelinski BWC at 1:46–1:58.) Canfield's girlfriend, Jakayla Wright, who was present with Canfield at the motel when officers arrived, confirmed that the child was previously dropped off. (Kobelinski BWC at 1:46–1:58.)

After Canfield was placed in the back of a squad vehicle, officers allowed Wright to come to the vehicle to say goodbye. (Lopez BWC at 4:08–20.) Canfield and Wright stated that they live in their car and are homeless. (Lopez BWC at 3:18–37, 4:35–59, 7:15–19.) Canfield and Wright stated that she had no money, no phone, and nowhere to go. (Lopez BWC at 6:08–7:20.)

When Officer Kobelinski asked Wright for identification, she told him that her purse was in Canfield's car. (Kobelinski BWC at 2:00–04.) Officer Langfeldt later told Wright they would have to search the purse to give it back to her. (Media Ex. 14, Rivera BWC-3 at 0:46–1:05.) After wavering about whether she wanted her purse, Wright stated, "you can grab it, it's in the back seat." (Rivera BWC-3 at 1:30–32.) Officer Langfeldt retrieved the purse from the back seat, searched it, and handed it to Wright. (Rivera BWC-3 at 1:46–3:04.)

Officer Langfeldt and three other officers discussed what to do with the Infiniti. (Langfeldt BWC-1 at 5:08–21.) Wright had already told the officers that she "can't drive." (Kobelinski BWC at 4:27–29.) Officer Langfeldt appears to say, "It's a private lot, so makes it tough to tow, prisoner property you're saying cuz she can't drive it?" (Langfeldt BWC-1 at 5:14–21.) Another officer suggests they could label it an evidence tow, take it to a tow

lot, and do a warrant on it, and the officers all appear to agree that's the approach they would take. (Langfeldt BWC-1 at 5:19–55.) The government states that a tow authorization report was completed as required by Milwaukee Police Department Standard Operating Procedure 610. (ECF No. 90 at 7 (citing Vehicle Info Audit History, Supp_100–102).)

Officers proceeded to search the motel room that Canfield vacated. (Langfeldt BWC-1 at 5:33–6:04.) No firearm was located in the room.

Officer Povlick transported Canfield from the scene to the District 4 headquarters. (Media Ex. 11, Povlick BWC at 8:50–40:25.) During the booking process Officer Langfeldt told Povlick that Canfield's booking charges include felon in possession, "DCDV" and pointing and aiming a firearm. (Media Ex. 11, Povlick BWC at 46:52–47:10.)

A booking summary reflects that Canfield's charges listed the following five offenses: 941.29(1m)(a), possession of a firearm-convicted felon in this state; 947.01(1), disorderly conduct with a domestic abuse charge modifier; 941.20(1)(c), intentionally point firearm at person; 961.41(3g)(g), possession of methamphetamine; and 943.34(1)(bm), receiving a stolen property. (Booking Summary, Supp_104–06.) The charge date and time listed for all five offenses on the booking summary is February 17, 2025, at 11:13 AM. (Booking Summary, Supp_104–06.) As addressed in the analysis section below, Canfield argues that the time on the booking summary is evidence that officers prematurely searched his car because it reflects that they charged him with possession of

stolen property and drugs hours before they secured a warrant and conducted the search during which the government claims the items were discovered. (ECF No. 83 at 27.) However, the charges could not have been entered at 11:13 AM because Canfield was arrested at the motel on February 17, 2025, at approximately 11:13 AM. (*See* ECF No. 83 at 8 (Canfield's opening suppression brief acknowledges that the officers turned on their body worn cameras at 11:12 AM to enter the parking lot and arrest him).)

The government explains that it checked the time the charges were entered by the Milwaukee Police Department and the first three charges were entered at 12:45 PM, while the possession of methamphetamine and receiving stolen property charges were entered at 4:25 PM. (ECF No. 90 at 8.) The government provides a copy of an email exchange between Police Service Special Investigator Caroline Knitter and Police Officer Margarita A. Diaz-Berg that indicates Diaz-Berg provided screenshots for "the booking charges time stamp for Mr. Larry Canfield." (ECF No. 90-4, Supp_181.) There is no further explanation about the screenshots but, if read at face value, they could suggest that the first three charges were entered at 12:45 PM, while the last two (under 961.41(3g)(g) and 943.34(1)(bm)) were entered at 4:29 PM[7] on February 17, 2025. (ECF No. 90-4, Supp_182–86 (reflecting statutes and a "source date/time" for each of the five charges).)

---

[7] The government's brief states 4:25 PM, while the cited exhibit reflects 16:29 (4:29 PM). (ECF No. 90 at 8; ECF No. 90-4, Supp_185–86.)

At 2:46 PM on February 17, 2025, Officer Rivera obtained a search warrant for the Infiniti. (Search Warrant, Canfield 56–61.) A search of the vehicle ensued at 3:23 PM. (CAD Printout, Supp_165.) From the glovebox officers recovered a loaded black pistol, a small amount of a substance that field tested positive for MDMA, and a black scale. (Media Ex. 15, Langfeldt BWC-2 at 0:58–1:46, 3:00–17, 3:33–44; Fuerte Police Report, Canfield_42.) A check of the serial number on the pistol indicated that it was stolen. (Arrest Reports, Canfield_43). Canfield's DNA was later matched to multiple locations on the firearm, including the trigger, grip, button and sights. (DNA Results, Defense_24–25.)

## 5. Motion to Suppress

Canfield moves to suppress all evidence derived from his warrantless arrest, the warrantless seizure and alleged pre-warrant search of his vehicle, the allegedly tainted subsequent search warrant, and the purported surveillance allegedly used to locate him. (ECF No. 83 at 1.)

### 5.1. Timeliness

The government argues that Canfield's motion to suppress is untimely and should be denied outright because he forfeited his right to pursue suppression when he requested an evidentiary hearing without raising his suppression arguments. (ECF No. 90 at 9–10.) In opposing Canfield's motion for an evidentiary hearing the government did not contend that Canfield should be denied the extension he requested therein to

subsequently file substantive pretrial motions, such as those pending now. (ECF No. 59 at 2–3.) Given the complex progression of this case and severity of the factual discrepancies Canfield accused the government of withholding, the court ruled on the motion for an evidentiary hearing and extended the deadline for filing pretrial motions one final time. (ECF No. 80 at 2, 15.) Therefore, Canfield's pending motions are properly before this court.

**5.2. Warrantless Arrest**

Canfield argues that his warrantless arrest was unlawful because the "wanted person" entry in the police database did not provide probable cause, the government cannot rely on the collective knowledge doctrine, and B.R.'s reports contradicted themselves. (ECF No. 83 at 19–23.)

The government responds that Officers Fuerte and Langfeldt had probable cause to arrest Canfield based on the "wanted person" entry, their familiarity with the investigation into B.R.'s report, and a violation of Wisconsin traffic laws. (ECF No. 90 at 13–15.)

Canfield replies that there are factual disputes about the officers' knowledge and about the FLOCK data that should be established through evidence rather than "unsupported attorney assertions or an unsworn account of what an officer would say." (ECF No. 92 at 3–5.)

"An arrest is lawful under the Fourth Amendment so long as it is made based on probable cause." *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016). "Officers have probable cause to arrest when the facts and circumstances known to them 'reasonably support a belief that the individual has committed, is committing, or is about to commit a crime.'" *United States v. Davis*, 119 F.4th 500, 505 (7th Cir. 2024) (quoting *Doe v. Gray*, 75 F.4th 710, 718 (7th Cir. 2023)). "Whether probable cause exists is a 'commonsense, practical question' made considering the totality of the circumstances." *Hill*, 818 F.3d at 294 (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)). A court reviewing a probable cause determination weighs the evidence "as understood by those versed in the field of law enforcement." *Hill*, 818 F.3d at 294 (quoting *Gates*, 462 U.S. at 232).

"The principal components of a determination of … probable cause will be the events which occurred leading up to the [arrest], and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to … probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). This means that, under the totality of the circumstances, officers must "reasonably believe that a particular individual has committed a crime." *United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996) (quoting *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995)). Although more than mere suspicion is required, probable cause does not require virtual certainty. *Gilbert*, 45 F.3d at 1166 (citing *Gates*, 462 U.S. at 295 (1983)) ("[P]robable cause

requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.").

Canfield acknowledges that Officer Fuerte, who was one of the arresting officers, listened to B.R.'s 911 calls. (ECF No. 83 at 22.) He claims Officer Fuerte was therefore aware of B.R.'s contradicting statements about whether she had seen Canfield with a gun on February 14, 2025. (*Id.*) He also asserts that, "if the Court is going to make a factual finding that Fuerte's search produced results of Canfield's car's whereabouts, then the Court must find that those results also demonstrated Canfield traveled to the police station immediately after [B.R.'s] false property damage report." (*Id.*) He claims that the timing of his visit to the police station contradicts B.R.'s allegation that Canfield pointed a gun in her face "maybe like 2 minutes" before her second call because it was made about thirty minutes after the first call. (*Id.*) Canfield concludes that the contradictions "affirmatively dismantle[] the officer's probable cause." (*Id.*)

The court does not need to make a factual finding about Officer Fuerte's FLOCK search results. Even if the government's version of events was not precisely or properly preserved, that does not mean that officers necessarily used unconstitutional means to locate Canfield. Moreover, as the court held when denying Canfield's latest request for an evidentiary hearing, he has not identified a dispute on this point supported by any definite or nonconjectural facts. (*See* ECF No. 80 at 10–11.)

Canfield disputes whether and how the arresting officers investigated B.R.'s allegations beyond listening to the 911 calls before arresting him. (ECF No. 83 at 21–22.) Even if Officer Fuerte did nothing more than listen to the two 911 calls, he had probable cause to arrest Canfield for possessing a firearm and threatening B.R. with it. If Officer Fuerte did conduct further investigation, the parties have not presented anything he learned in the intervening time that negated that probable cause. B.R.'s statements were not necessarily inconsistent. They could be interpreted to mean that she did not initially see Canfield with a firearm and that he threatened her with it after she made the first call. Canfield has not demonstrated how or why the arresting officers should have known about his alleged trip to the police station to report B.R., nor has he established the timing of his visit or any necessary inconsistency with B.R.'s report. Officers are not required to continue investigating once they have probable cause. *See Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 624 (7th Cir. 2010) ("While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation.").

Because at least one arresting officer had probable cause to believe Canfield had committed a crime, the warrantless arrest was not unconstitutional.

**5.3. Vehicle Seizure**

Canfield argues that the warrantless seizure of his vehicle occurred without probable cause or any lawful towing authority. (ECF No. 83 at 23–26.) He claims the

government has not demonstrated a fair probability that the car contained a gun when it was seized three days after the report giving rise to his arrest. (*Id.* at 26.) He also asserts that the officers' contradictory tow classifications (variously citing "prisoner's property," "evidence," and "investigation") reinforce the unlawfulness of the seizure. (*Id.* at 24–25.)

The government responds that the officers had probable cause to search and seize the car because they reasonably believed it contained evidence of a crime—namely, the firearm involved in the alleged offense three days prior. (ECF No. 90 at 15–19.)

Canfield replies that the government has failed to establish probable cause that a firearm was inside the vehicle when the officers seized it and that none of the government's alternative theories for towing authority can independently uphold the seizure. (ECF No. 92 at 14.)

"The decision to impound an automobile, unless it is supported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots." *United States v. Duguay*, 93 F.3d 346, 353 (7th Cir. 1996). The decision to impound a vehicle is properly analyzed as distinct from the decision to search the vehicle. *See id.* at 351.

Canfield argues that the government "cannot justify the seizure through the later warrant unless probable cause already existed when officers took control of the car." (ECF No. 83 at 25.) As the court already recounted, Officer Fuerte, at the very least, knew that B.R. accused Canfield of pointing a firearm at her. Canfield does not dispute that the

officers also knew he was living out of the vehicle. No firearm was found on Canfield after his arrest, nor was a firearm recovered from the search of the motel room he had just vacated.

On this record, objective facts provided probable cause for a reasonable officer to believe that a firearm involved in a criminal offense would be located inside the vehicle. *See United States v. Ross*, 456 U.S. 798, 808 (1982) ("[T]he probable-cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers.").

Because at least one involved officer had probable cause to believe evidence of a crime would be found inside the vehicle, the warrantless seizure was not unconstitutional.

**5.4. Pre-Warrant Searches**

Canfield argues that officers conducted pre-warrant searches of his car and that all fruits thereof must be suppressed. (ECF No. 83 at 26–28.) He states that officers entered the car to retrieve the community contact card and to collect Jakayla's purse,[8] and then, according to tow paperwork, to conduct an alleged "vehicle visual inspection." (*Id.* at 26.) He claims that booking records also indicate an extensive search of the vehicle, including of the glove box, occurred prior to execution of the warrant. (*Id.*) He further claims,

[8] Canfield refers to the vehicle entries for the community contact card and Jakayla's purse as "searches" but does not argue that the officers lacked consent to enter the vehicle at those times or that they searched the vehicle and discovered any evidence that should be suppressed. (ECF No. 83 at 26–28.)

without citation, that officers booked him for gun and drug possession at 12:36 PM even though the officers claim they did not search the vehicle until later that afternoon. (ECF No. 83 at 27.) Canfield argues that the disputed chronology entitles him to an evidentiary hearing. (*Id.* at 28.)

The government responds that the officers had authority to search the car after Canfield's arrest because there was probable cause to believe it contained evidence of a crime. (ECF No. 90 at 18.) It contends that no evidence, including the booking summary, suggests there was a pre-warrant search of the car. (*Id.* at 18–19.) The government asserts that, even if the court rejects the evidence that no search occurred prior to the issuance of the warrant, the inevitable discovery doctrine would prevent suppression of the firearm. (*Id.* at 19–21.)

"The doctrine of inevitable discovery provides that illegally obtained evidence will not be excluded if the Government can prove, by a preponderance of the evidence, that the officers 'ultimately or inevitably would have ... discovered [the challenged evidence] by lawful means.'" *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009). "To satisfy this burden, the Government must demonstrate … that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence … [and] that it would have conducted a lawful search absent the challenged conduct." *Id.*

Even if the officers conducted a pre-warrant search *and* it was unlawful,[9] there is no question here that the officers had legal justification to search the Infiniti and would have conducted a lawful search. As discussed with respect to the vehicle seizure, at least one officer had probable cause to believe a firearm used in the commission of a crime would be found in the vehicle, and officers obtained a state search warrant for that reason. *See United States v. Rosario*, 5 F.4th 706, 714 (7th Cir. 2021) (observing that the government must "prove that a warrant would certainly, and not merely probably, have been issued had it been applied for"). As discussed next, Canfield has not identified any basis by which any alleged premature search infected the issued search warrant.

Because the doctrine of inevitable discovery would prevent suppression of the firearm even if a premature search occurred, the court will recommend that Canfield's motion be denied with respect to his pre-warrant search theory. Given this conclusion, Canfield has not identified a dispute of material fact, and the court will deny his renewed request for an evidentiary hearing. (ECF No. 83 at 28.)

**5.5. Validity of Warrant**

Canfield argues that the warrant that authorized the search of his vehicle was invalid because it relied on unlawfully obtained information, contained material

---

[9] The parties do not mention the automobile exception to the warrant requirement in briefing, but the court has determined that there was probable cause to believe the vehicle contained evidence of a crime. *See United States v. Chavez*, 625 F. Supp. 3d 760, 772 (N.D. Ill. 2022) ("The automobile exception permits warrantless searches of cars when police have 'probable cause to believe it contains evidence of criminal activity.'").

omissions, and lacked probable cause. (ECF No. 83 at 28–31.) He claims the search warrant relied on B.R.'s "false" allegation that she saw him with a gun three days prior. (*Id.*) He contends that nobody "reported the gun returning to the car" because one of the children reported him removing a firearm from the driver's seat and placing it in his waistband or coat pocket, but "[n]o source reported that he stored guns in the car." (*Id.* at 28–29.) He argues that "a three-day-old observation of a gun exiting a car does not establish a fair probability the gun was back inside" the vehicle. (*Id.* at 29.) He also asserts that "the government cannot prove [the search warrant] was untainted by the prior seizures and entries." (*Id.*)

The government responds that the search warrant was supported by probable cause. (ECF No. 90 at 21–24.) It points to the contents of the warrant application, which reflects that B.R. and her two children in common with Canfield all reported Canfield possessed a firearm on February 14, 2025; that B.R. and one child reported that Canfield pointed the firearm at B.R. and threatened to kill her; that Canfield left the area in a white Infiniti; that Canfield was previously convicted of a felony in federal court; that Canfield was arrested in the vicinity of a white Infiniti; and that no weapon was discovered during a search of Canfield's person. (*Id.* at 23; *see also* Search Warrant, Canfield_58–60.)

None of the factual assertions in the warrant affidavit bear any semblance of connection to the premature search that Canfield alleges the officers conducted on his vehicle. Although the warrant application did not include the details that Canfield

reported being homeless and living out of the Infiniti after vacating the motel room that officers already searched (which would have further bolstered the likelihood that the firearm would be found inside the vehicle), the court concludes the warrant was supported by probable cause.

The government also argues that the good faith doctrine would prevent suppression of the firearm even if the warrant was invalid. (ECF No. 90 at 23–24.) Canfield replies that the good faith doctrine would "not protect reliance on a warrant when the issuing judicial officer was misled by information the affiant knew was false or would have known was false but for reckless disregard of the truth." (ECF No. 92 at 19.) Canfield has not established that the officers should have even suspected that B.R. and the children's reports were false.

Under the good-faith doctrine, "suppression is not warranted when police officers who executed the warrant relied in good faith on the issuing judge's decision of probable cause." *United States v. Douglas*, 164 F.4th 1017, 1021–22 (7th Cir. 2026) (citing *United States v. Leon*, 468 U.S. 897 (1984)). "An officer's decision to obtain a warrant is *prima facie* evidence that he or she was acting in good faith." *United States v. Woodfork*, 999 F.3d 511, 520 (7th Cir. 2021) (citation omitted). A defendant may rebut this good-faith presumption: "(1) when the affiant was dishonest or reckless when preparing the affidavit, (2) when the judge abandons the judicial role of neutrality, or (3) when the affidavit is so 'bare

bones' and lacking in probable cause that reliance on it is unreasonable." *Douglas*, 164 F.4th at 1022.

Canfield has presented no evidence that Officer Rivera was dishonest when preparing his affidavit. As to any alleged recklessness, Officer Rivera's warrant affidavit established probable cause even without the details he omitted about Canfield being homeless and living out of the Infiniti after vacating the motel room that officers already searched. The record also does not reflect that Officer Rivera doubted or should have doubted the veracity of B.R. and the children's reports that Canfield possessed a firearm. The issuing judicial officer did not abandon the role of neutrality, and the affidavit was not lacking in probable cause. *See Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006) (explaining that "[p]olice officers have probable cause to arrest an individual when 'the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed' an offense").

Accordingly, even if the search warrant was invalid, the good faith doctrine would preclude suppression of the firearm.

**5.6. Surveillance**

Canfield argues that the government cannot demonstrate that it located him lawfully. (ECF No. 83 at 32–35.) However, he has not established that the government has an obligation to demonstrate how the officers came to locate him outside the motel.

Canfield relies on the absence or delay of information to conclude that officers must have used a cell site simulator or unlawful surveillance measures. (*See id.*) But the absence of information is the opposite of definite, specific, detailed, and nonconjectural facts. *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality" without relying "on vague, conclusory allegations.") (citation omitted).

The government responds that the officers did not use a cell site simulator or any means other than FLOCK and eTIME to locate Canfield. (ECF No. 90 at 28–31.) The government contends that officers not only did not know where Canfield resided, but they also did not have an IMSI number for Canfield's phone. (*Id.* at 30.) As the court determined in its ruling on the motion for an evidentiary hearing, Canfield has not provided any evidence that officers obtained his phone's IMSI number or that a cell site simulator was employed to locate him. (ECF No. 80 at 11.)

Accordingly, Canfield has not established any basis for suppression with respect to how officers located him on the day of his arrest.

5. **Conclusion**

**IT IS THEREFORE RECOMMENDED** that the defendant's motion to dismiss the original indictment (ECF No. 81) be **granted**.

**IT IS FURTHER ORDERED** that Canfield's request for an evidentiary hearing (ECF No. 83) is **denied**.

**IT IS FURTHER RECOMMENDED** that the defendant's motion to suppress (ECF No. 83) be **denied**.

**IT IS FURTHER RECOMMENDED** that the defendant's motion to dismiss the superseding indictment (ECF No. 93) be **denied**.

**IT IS FURTHER ORDERED** that, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), any written objection to any recommendation herein or part thereof shall be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Failure to timely object waives a party's right to review.

Dated at Milwaukee, Wisconsin this 15th day of October, 2026.

William E. Duffin

WILLIAM E. DUFFIN
U.S. Magistrate Judge